FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

AUG - 3 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Scan

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT ALLEN BAUDERS, JR., | Case No. EDCV 06-0189-JSL (RNB) |
| Petitioner, | REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| vs. | |
| DERRAL G. ADAMS, Warden, | |
| Respondent. | |

This Report and Recommendation is submitted to the Honorable J. Spencer Letts, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## PROCEEDINGS

On February 22, 2006, petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Pet.") herein. In accordance with the Court's Order Requiring Response to Petition, respondent filed a Motion to Dismiss on March 23, 2006, contending that Grounds Two and Three were unexhausted. In a Minute Order issued on March 27, 2006, the Court found that Ground Three was unexhausted, but that Ground Two was properly exhausted if petitioner intended to frame the issue as

DOCKETED ON CM

AUG - 4 2006

BY            040

he did in his Petition for Review to the California Supreme Court. The Court advised petitioner of his options to convince the Court that Ground Three was exhausted, to withdraw the claim, or to make the requisite showing under <u>Rhines v. Webber</u> for invocation of the stay-and-abeyance procedure. By Motion to Amend, accompanied by an "Amended Petition" ("Amd. Pet."), petitioner thereafter moved to withdraw Ground Three in the pending Petition and confirmed that he intended that his second claim conform to that claim raised in his Petition for Review.[1] In a Minute Order issued on May 4, 2006, the Court granted petitioner's Motion to Amend, denied respondent's Motion to Dismiss, and ordered respondent to file an Answer to Grounds One, Two, and Four. On June 19, 2006, respondent filed an Answer to Petition ("Ans."), along with a supporting memorandum of points and authorities ("Ans. Mem."). On July 17, 2006, petitioner filed a Reply thereto, along with a supporting memorandum of points and authorities ("Reply Mem.").

Thus, this matter now is ready for decision.

//

//

---

[1]    In his Motion to Amend, petitioner initially indicated his intent to withdraw both Grounds Two and Three of the original Petition. It appeared to the Court that petitioner's motion had crossed in the mail with the Court's March 27, 2006 Minute Order. In a Minute Order dated April 17, 2006, the Court gave petitioner the option of clarifying his intent with respect to Ground Two. On May 1, 2006, petitioner filed a document captioned "Petitioner's Response to the Court's Minute Order Dated April 17, 2006," wherein he indicated his intent to withdraw only Ground Three and to proceed on Ground Two as raised in his Petition for Review.

In submitting his Amended Petition, petitioner included only Grounds One and Four from his original Petition, but renumbered the original fourth claim as "Ground Two." To alleviate the need to refer to both petitions hereinafter, and because the substance of petitioner's two claims in the Amended Petition is the same as the substance of those claims in the original Petition, the Court will cite to petitioner's original Petition (sans Ground Three) as the operative petition.

2

## PROCEDURAL HISTORY

On March 8, 2004, a Riverside County Superior Court jury found petitioner guilty of second degree murder and assault with a deadly weapon. (See 2 Clerk's Transcript on Appeal ["CT"] 504-05; 4 Reporter's Transcript on Appeal ["RT"] 872-73). The jury also found true the special allegation that during the commission of the murder, petitioner personally used a deadly and dangerous weapon, a metal pipe, within the meaning of Cal. Penal Code §§ 12022(b)(1) and 1198.7(c)(23). (See 2 CT 506; 4 RT 873). On May 4, 2004, the trial court sentenced petitioner to state prison for an indeterminate term of 16 years to life. (See 3 CT 635-36, 690-91; 4 RT 897).

Petitioner appealed his conviction and sentence to the California Court of Appeal, raising claims generally corresponding to Grounds One, Two, and Four of the Petition herein. (See Respondent's Notice of Lodgment ["Lodgment"] No. 2). In an unpublished decision issued on June 20, 2005, the California Court of Appeal rejected petitioner's claims and affirmed the judgment. (See Lodgment No. 5). Petitioner's Petition for Rehearing in the California Court of Appeal subsequently was denied without comment. (See Lodgment Nos. 6, 7). Petitioner then filed a Petition for Review with the California Supreme Court raising claims generally corresponding to Grounds One and Two, and joining his co-defendant's Petition for Review, raising a claim generally corresponding to Ground Four of the Petition herein. (See Lodgment No. 8). The California Supreme Court denied the Petition for Review on September 21, 2005, "without prejudice to any relief to which defendant might be entitled after this court decided [sic] *People v. Cage*, S127373." (See Lodgment No. 10).

Petitioner raised no collateral challenges to his conviction in state court.

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

Since petitioner is not challenging the sufficiency of the evidence to support the conviction, the Court adopts the factual history section from the California Court of

1  Appeal opinion as a fair and accurate summary of the evidence presented at trial
2  (Lodgment No. 5 at 2-4):

3       *On July 20, 2002,* [petitioner] *and* [co-defendant] *Reyes attended a party, where*
4  *a shouting match turned violent as defendants used a metal pipe and a wooden stick*
5  *to strike the victim, Manual Llamas, in the head, causing his death.  The Riverside*
6  *County District Attorney charged* [petitioner] *and Reyes with one count of*
7  *premeditated murder. (Pen. Code § 197* [sic] *subd. (a).) The district attorney charged*
8  *both defendants with the use of a deadly and dangerous weapon, specifically, a metal*
9  *pipe by* [petitioner] *and a wooden club by Reyes.  (Pen. Code, § 12022, subd. (b)(1).)*
10 *The district attorney also charged both defendants with one count of assault with a*
11 *deadly weapon.  (Pen. Code, § 245, subd. (a)(1).)*

12      *During the trial, several partygoers described the fight and circumstances*
13 *surrounding the fight. Joel Vazquez[2] testified that Thomas Johnson hosted the party*
14 *at his home in Glen Avon.  Vazquez agreed to serve as the door keeper and bouncer.*
15 *Vazquez observed* [petitioner] *and Reyes at the party with their usual group of friends,*
16 *including Scott Heyerman,[3] Vazquez's girlfriend, Alisha Studley, and Reyes's sister,*
17 *Susie Reyes.[4]*

18      *In the early morning hours of July 21, 2002, Vazquez heard an argument*
19 *between* [petitioner] *and Reyes's group and another group including Vazquez's*
20 *brother, Alex, and Vazquez's friends.  An offensive comment directed at some of the*

---

23   [2]   This Court has corrected the California Court of Appeal's multiple
references to witness "Joel Vasquez," whose name is actually spelled "Vazquez." (See
2 RT 233).

25   [3]   Scott Heyerman did not testify at trial. Based on different spellings of his
name in the Reporter's Transcript on Appeal, it is unclear whether his name is spelled
"Heyerman" or "Hyerman."

28   [4]   Alisha Studley was petitioner's girlfriend. (See 1 CT 249).

4

1   *female partygoers triggered a verbal argument, which escalated into a pushing match.*
2   *When Vazquez yelled for everyone to calm down, the fighting stopped and the crowd*
3   *dispersed. Vazquez noticed* [petitioner] *walking towards his car. Reyes's friend, Luis*
4   *Jiminez, saw someone returning with an object in his hands. Another one of Reyes's*
5   *friends, Anthony Mendoza, observed* [petitioner] *holding something behind his back.*

6          *After the initial altercation, another scuffle erupted, beginning with Llamas and*
7   *Reyes. Studley heard Reyes say, "Fuck these fools," and "you want to get it on?"*
8   *According to Vazquez, as* [petitioner] *faced Llamas, he raised his left hand and struck*
9   *Llamas with a pipe on the right side of his head. The pipe was about 18 inches in*
10  *length and three-quarters of an inch in width. Llamas was unarmed. Alex also*
11  *witnessed this initial blow.*

12         *Reyes was standing behind Llamas on his left side. Vazquez and Studley saw*
13  *Reyes strike Llamas with a wooden stick on the back of his head. The wooden stick*
14  *was about two-feet long. The fight took place in Johnson's back dirt lot, where pieces*
15  *of wood were strewn on the ground. After his head jerked forward, Llamas fell to the*
16  *ground. As Llamas was still staggering on his feet,* [petitioner] *with the pipe in his*
17  *hand, took another swing at Llamas's head. After Llamas fell,* [petitioner] *struck him*
18  *again.*

19         *When Vazquez attempted to restrain* [petitioner], [petitioner] *struck Vazquez on*
20  *the side of his head. Alex yelled for his brother to let* [petitioner] *go because Llamas*
21  *was on the ground.* [Petitioner] *and Reyes went to their cars and left in a hurry. Susie*
22  *tried to help Llamas, but then left with the others.*

23         [Petitioner], *Reyes, and their friends regrouped at a park. On the way to the*
24  *park, Reyes indicated his motions with the wooden stick by saying, "pah, pah, pah."*
25  *At the park,* [petitioner] *admitted that he "fucked up" and Reyes also admitted that he*
26  *"fucked that fool up."*

27         *During the trial, the court admitted Reyes's taped police interview with*
28  *investigator Michael Lujan. During the interview, Reyes initially explained that,*

1   *although other people attempted to hit him, he was not involved in the fight. After*
2   *Lujan repeatedly prodded him to tell the truth, Reyes admitted that he threw some*
3   *punches to defend himself. Later, Reyes also admitted that he took a stick from*
4   *someone and struck the victim on the back of the head, causing him to fall.*

5       *As result of his injuries, Llamas died on July 29, 2002. The pathologist testified*
6   *that the cause of death was brain swelling caused by the blows to the head. The*
7   *pathologist estimated five to seven blows to Llamas's head, including one to his left ear*
8   *area, one to his right ear area, three to the back of his head, and possibly another blow*
9   *to the top of his head.*

10

11                          **PETITIONER'S CLAIMS**[5]

12       1.      Petitioner's federal constitutional right to confrontation under the Fifth,
13  Sixth, and Fourteenth Amendments was violated by the admission of hearsay
14  testimonial evidence. (<u>See</u> Pet. at 5[6]; Reply Mem. at 3-7).

15       2.      The trial court committed instructional error in violation of petitioner's
16  Fourteenth Amendment right to a fair trial. (<u>See</u> Pet. at 7; Reply Mem. at 8-10).

17       3.      [Withdrawn.]

18       4.      Petitioner's federal constitutional rights to a fair trial and due process
19  under the Fifth, Sixth, and Fourteenth Amendments were violated by the admission of
20  gang evidence. (<u>See</u> Pet. at 10; Reply Mem. at 11-15).

21  //

22  _____

23       [5]    To the extent that petitioner appears to be contending for the first time
24  in his Reply that he is entitled to habeas relief due to cumulative error (<u>see</u> Reply
25  Mem. at 14-15), the Court declines to address this unexhausted claim. <u>See</u> <u>Cacoperdo</u>
    <u>v. Demosthenes</u>, 37 F.3d 504, 507-08 (9th Cir. 1994) ("A Traverse is not the proper
26  pleading to raise additional grounds for relief."), <u>cert.</u> <u>denied</u>, 514 U.S. 1026 (1995).

27       [6]    The Court has sequentially numbered the pages of the pending Petition.
28

## STANDARD OF REVIEW

The standard of review applicable to petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

Further, a state court factual determination must be presumed correct unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1) (as amended).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. See Williams, 529 U.S. at 391, 413. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. See Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam); Williams, 529 U.S. at 405-06. When a state court decision adjudicating a claim is

1  contrary to controlling Supreme Court law, the reviewing federal habeas court is

2  "unconstrained by § 2254(d)(1)." Williams, 529 U.S. at 406. However, the state court

3  need not cite or even be aware of the controlling Supreme Court cases, "so long as

4  neither the reasoning nor the result of the state-court decision contradicts them." Early,

5  537 U.S. at 8.

6         State court decisions that are not "contrary to" Supreme Court law may only be

7  set aside on federal habeas review "if they are not merely erroneous, but 'an

8  unreasonable application' of clearly established federal law, or are based on 'an

9  unreasonable determination of the facts.'" Early, 537 U.S. at 11 (citing 28 U.S.C.

10 § 2254(d) and adding emphasis). A state court decision that correctly identified the

11 governing legal rule may be rejected if it unreasonably applied the rule to the facts of

12 a particular case. See Williams, 529 U.S. at 406-10, 413 (e.g., the rejected decision

13 may state Strickland rule correctly but apply it unreasonably); Woodford v. Visciotti,

14 537 U.S. 19, 24-27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam). However,

15 to obtain federal habeas relief for such an "unreasonable application," a petitioner must

16 show that the state court's application of Supreme Court law was "objectively

17 unreasonable." Woodford, 537 U.S. at 24-27; Williams, 529 U.S. at 413. An

18 "unreasonable application" is different from an erroneous or incorrect one. See

19 Williams, 529 U.S. at 409-10; see also Woodford, 537 U.S. at 25; Bell v. Cone, 535

20 U.S. 685, 699, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

21

22                              **DISCUSSION**

23 **A.    Habeas relief is not warranted with respect to petitioner's Confrontation**

24        **Clause claim.**

25        Separately, both petitioner and his co-defendant Reyes made statements to the

26 police regarding the murder. During the trial, the prosecutor indicated that he did not

27 intend to introduce the audio tape of petitioner's statement to police, but that he did

28 intend to introduce Reyes's statement to police. (See 3 RT 531-32, 581). Petitioner's

1  counsel was given a transcript of Reyes's statement and indicated that he would use the
2  lunch hour to confirm that all redactions made by the prosecutor were appropriate and
3  that no further redactions were necessary. (See 3 RT 581-82). After the lunch recess,
4  petitioner's counsel objected to one reference in the interview to petitioner's
5  involvement in the "DK" gang. The trial court granted the request to strike that
6  reference. (See 3 RT 613-15). Counsel indicated that he did not believe any other
7  redactions were necessary.[7] (See 3 RT 616).

8      Sheriff's Investigator Michael Lujan took the stand to testify regarding his
9  conversation with Reyes, during which time the tapes of that interview were played for
10 the jurors. (See 3 RT 620-21). During the interview, Reyes initially denied being
11 involved in the fight at the party, but later admitted to hitting people who were hitting
12 him. He also indicated that he had hit the "guy" on the floor one time in the back of
13 the head with a two-foot stick because the "guy" was bending down to pick up a stick.
14 The "guy" did not hit Reyes. (See 2 CT 348-52, 363, 378-92). Regarding petitioner,
15 Reyes indicated that he had known him for a couple of years and that on occasion they
16 would hang out. (See 2 CT 372-73, 458). Though Lujan indicated to Reyes that he
17 already knew that Reyes and petitioner had been involved in the fight, Reyes said that
18 he did not see petitioner in the fight and he did not talk to petitioner about it. (See 2
19 CT 358, 374-75, 458). Reyes indicated that he saw petitioner walk "slow[ly]" to the
20 car after the fight and that he joined him on the way to the car, and "rode" with
21 petitioner. Reyes said that he did not see anyone else hit the "guy" with a stick. (See
22 2 CT 391). Reyes denied that he had talked to petitioner about the fight after the party.
23 He indicated that he did not know who killed Llamas and did not know how Llamas
24 died. (See 2 CT 455, 463).

25
26 _____
27   [7]    Redactions were reflected by a bracketed phrase in the transcript
    distributed to the jury which read "portion deleted by agreement of counsel." (See 2
28 CT 379, 454, 457, 461, 463).

1    The prosecutor used Reyes's statement to police to argue his guilt in closing, but
2  did not argue that the statement could or should be used against petitioner. (See 2
3  Supplemental RT ("SRT") 253-56, 273). After closing arguments, the jury was
4  instructed pursuant to CALJIC No. 2.08 as follows:

5         "Evidence has been received of a statement made by the Defendant
6         Martin Reyes after his arrest to Investigator Lujan. Do not consider the
7         evidence of this statement against the other Defendant Scott Bauders.
8         The statement can only be used by you in determining the guilt or
9         innocence of Defendant Martin Reyes." (See 4 RT 846, 2 CT 573).

10

11    Petitioner contends that the admission of Reyes's statement violated his federal
12  constitutional right to confrontation as this "testimonial evidence [was] obtained
13  without opportunity for cross-examination [and] was admitted via hearsay." (See Pet.
14  at 5; Reply Mem. at 3-7).

15

16    1.    Applicable legal authority
17    A primary interest secured by the Confrontation Clause of the Sixth Amendment
18  is the right of an accused in a criminal prosecution to cross-examine witnesses against
19  him or her. See Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S. Ct. 1431, 89 L.
20  Ed. 2d 674 (1986); Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d
21  347 (1974). Recently, in Crawford v. Washington, 541 U.S. 36, 68, 124 S. Ct. 1354,
22  158 L. Ed. 2d 177 (2004), the United States Supreme Court held that the Confrontation
23  Clause bars the admission of testimonial hearsay unless the declarant is unavailable
24  and the accused had "a prior opportunity for cross-examination." Statements given to
25  police during interrogations qualify as "testimonial." See id. at 59, 68. The Crawford
26  holding abrogated, in part, the prior rule that the admission of testimonial hearsay did
27  not violate the Confrontation Clause if the declarant was unavailable and the statement
28  fell under a "firmly rooted hearsay exception" or otherwise bore indicia of reliability.

1 Ohio v. Roberts, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). Further,
2 the Ninth Circuit recently held that "[b]ecause the Crawford rule is both a 'watershed
3 rule' and one 'without which the likelihood of an accurate conviction is seriously
4 diminished,'" the rule applies retroactively under Teague v. Lane, 489 U.S. 288, 307,
5 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). Bockting v. Bayer, 399 F.3d 1010, 1012-
6 13 (9th Cir.) (citing Schriro v. Summerlin, 542 U.S. 348, 124 S. Ct. 2519, 2523, 159
7 L. Ed. 2d 442 (2004)), as amended, 408 F.3d 1127 (9th Cir. 2005), cert. granted,
8 Whorton v. Bockting, 126 S. Ct. 2017 (May 15, 2006).

9          In Bruton v. United States, 391 U.S. 123, 135, 88 S. Ct. 1620, 20 L. Ed. 2d 476
10 (1968), the Supreme Court held that a defendant's Sixth Amendment right of
11 confrontation is violated when a facially incriminating confession of a nontestifying
12 co-defendant is admitted at a joint trial, even if the jury is instructed to consider the
13 confession only against the codefendant. In Richardson v. Marsh, 481 U.S. 200, 107
14 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), the Supreme Court limited Bruton's scope,
15 holding that "the Confrontation Clause is not violated by the admission of a
16 nontestifying codefendant's confession with a proper limiting instruction when, as
17 here, the confession is redacted to eliminate not only the defendant's name but any
18 reference to his or her existence." Marsh, 481 U.S. at 211. The Supreme Court noted
19 that the confession in Marsh, in contrast to the confession in Bruton, "was not
20 incriminating on its face, and became so only when linked with evidence introduced
21 later at trial (the defendant's own testimony)." Marsh, 481 U.S. at 208; Mason v.
22 Yarborough, 447 F.3d 693, 695 (9th Cir. 2006) ("Bruton specifically exempts a
23 statement, not incriminating on its face, that implicates the defendant only in
24 connection to other admitted evidence."); see also United States v. Olano, 62 F.3d 1180
25 (9th Cir. 1995) (noting that the Supreme Court in Marsh "'limited Bruton to
26 confessions that are facially incriminating'"), cert. denied, 519 U.S. 931 (1996).
27 Eleven years after the Marsh decision, in Gray v. Maryland, 523 U.S. 185, 118 S. Ct.
28 1151, 140 L. Ed. 2d 294 (1998), the Supreme Court held that symbols or neutral

11

1   pronouns were not acceptable replacements in lieu of a defendant's name: "Redactions
2   that simply replace a name with an obvious blank space or a word such as "deleted"
3   or a symbol or other similarly obvious indications of alteration . . . leave statements
4   that, considered as a class, so closely resemble <u>Bruton</u>'s unredacted statements that, in
5   our view, the law must require the same result." <u>Gray</u>, 523 U.S. at 192; <u>see also</u> <u>United</u>
6   <u>States v. Peterson</u>, 140 F.3d 819, 822 (9th Cir. 1998) ("<u>Gray</u> clarifies that the
7   substitution of a neutral pronoun or symbol in place of the defendant's name is not
8   permissible if it is obvious that an alteration has occurred to protect the identity of a
9   specific person.").

10

11       2.     <u>The California Court of Appeal opinion</u>[8]

12       Citing <u>Bruton</u>, <u>Crawford</u>, and <u>Marsh</u>, the California Court of Appeal rejected
13   petitioner's Confrontation Clause challenge on direct review, reasoning in pertinent
14   part:

15       "During Reyes's police interview, he reluctantly admitted his own
16       involvement in the fight, stating that he struck the victim on the back of
17       his head with a stick.  Reyes, however, denied any involvement by
18       codefendant [petitioner].  When Lujan questioned Reyes concerning the
19       identity of the man standing in front of Llamas, Reyes denied knowing
20       who the man was, whether he said anything to Llamas, and whether he
21       was armed.  According to Reyes, he hit Llamas once in the head, Llamas
22       fell, and the fighting stopped.  Reyes's statement, therefore, does not
23   //

24

25       [8]     Under <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 111 S. Ct. 2590, 115 L. Ed.
26   2d 706 (1991), it may be presumed that the California Supreme Court, by its silent
27   denial of petitioner's Petition for Review raising the same claim, did not intend to
     change the California Court of Appeal's reasoned decision rejecting it.  <u>See</u> <u>Ylst</u>, 501
28   U.S. at 803-04.

1    incriminate anyone else as responsible for the attack upon Llamas and his

2    resulting injuries.

3            "[Petitioner] nevertheless argues that Reyes's confession was

4    inferentially incriminating because the evidence suggested that Reyes lied

5    about himself and, therefore, lied about [petitioner].  In such case, an

6    instruction could prevent the jury from drawing the inappropriate

7    inference.  "[W]ith regard to such an explicit statement the only issue is,

8    plain and simply, whether the jury can possibly be expected to forget it

9    in assessing the defendant's guilt; whereas with regard to inferential

10   incrimination the judge's instruction may well be successful in dissuading

11   the jury from entering onto the path of inference in the first place, so that

12   there is no incrimination to forget."  (Richardson v. Marsh, supra, 481

13   U.S. at p. 208.)

14           "This is particularly true where the statements did not implicate

15   another person in the crime.  In this case, in order to arrive at the

16   conclusion that [petitioner] was responsible for Llamas's injuries, the jury

17   must not only find that Reyes lied, but also draw its fact from the other

18   evidence presented at trial.  The jury likely determined [petitioner's] guilt

19   from this other evidence, without having to infer [petitioner's] guilt from

20   Reyes's suspicious denials.  In any event, the court advised the jury

21   against drawing any impermissible inferences.

22           "We conclude that the trial court did not violate [petitioner's]

23   constitutional rights by admitted the redacted version of Reyes's

24   confession with a limiting instruction."  (Lodgment No. 5 at 6-7.)

25

26   3.      Analysis

27           As noted above, under Marsh, 481 U.S. at 208, 211, where the admitted co-

28   defendant's statement is not incriminating on its face and becomes so only when linked

with other adduced evidence, the Confrontation Clause is not violated where a proper limiting instruction is given. Here, the Court concurs with the California Court of Appeal that Reyes's statement did not incriminate anyone else in the crime, including petitioner. To the extent that the statement was incriminating when linked with other evidence presented at trial, the trial court's limiting instruction pursuant to CALJIC No. 2.08 properly protected petitioner's constitutional rights. The jurors are presumed to have followed the instructions given to them, see Marsh, 481 U.S. at 211; Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d. 727 (2000), and petitioner has failed to adduce any evidence that the jury failed to follow the foregoing instruction in this instance.[9]

Moreover, the Court disagrees with petitioner's contention that Crawford prohibits the admission of a co-defendant's statement to police "whether the statement was directly inculpatory . . . or not." (See Pet. at 5; Reply Mem. at 3). The primary concern in Crawford was the violation of the accused's right under the Confrontation Clause "to be confronted with the witnesses against him." 541 U.S. at 42. Crawford did not abrogate the Court's prior holding in Bruton or that in Marsh, which found no Sixth Amendment violation when the admitted statement was not facially incriminating and a limiting instruction was given. See Crawford, 541 U.S. at 57 (finding its decision consistent with many other Confrontation Clause cases, including Bruton). The Marsh Court observed that, "[o]rdinarily, a witness whose testimony is introduced

_____

[9]     To the extent that petitioner contends that the statements, "insinuations," and "accusations" of Investigator Lujan regarding petitioner during Reyes's interrogation incriminated him (see Reply Mem. at 4-6), their "admission" did not violate the Confrontation Clause. Even if it were assumed that Lujan's questions and statements during the interrogation were "testimonial" in nature, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Crawford, 541 U.S. at 59. Lujan was available for cross-examination at trial; petitioner's counsel simply declined the opportunity - twice - to cross-examine him. (See 3 RT 627, 635-1).

1   at a joint trial is not considered to be a witness 'against' a defendant if the jury is
2   instructed to consider that testimony only against a codefendant." <u>See</u> 481 U.S. at 206;
3   <u>see</u> <u>also</u> Mason, 447 F.3d at 698 (Wallace, J., concurring) (noting that "the Court held
4   [in <u>Marsh</u>] that the redaction and limiting instructions effectively prevented [co-
5   defendant] Williams from being a "witness against" Marsh, and therefore the
6   protections of the Confrontation Clause were not at issue").   Thus, this Court has no
7   basis for finding or concluding that the Confrontation Clause was violated here by the
8   admission of Reyes's statement.[10]

9        The Court therefore finds and concludes that the state courts' rejection of
10  petitioner's Confrontation Clause claim neither was contrary to nor involved an
11  unreasonable application of clearly established federal law, as determined by the
12  United States Supreme Court.

13

14  **B.    Habeas relief is not warranted with respect to petitioner's claim regarding**
15       **the admission of gang evidence.**

16       Petitioner contends that his federal constitutional rights to a fair trial and due
17  process under the Fifth, Sixth, and Fourteenth Amendments were violated by the
18  admission of gang evidence at trial.   (<u>See</u> Pet. at 10; Reply Mem. at 11-15).
19  Specifically, petitioner challenges the admission of evidence that Reyes claimed
20  membership in the "DK" gang and bullied others, and the admission of a recorded
21  statement of a party-goer claiming that she saw gang writing on a rug at the scene of
22  the murder and heard "gang yelling." (<u>See</u> Pet. at 10).

23

24       [10]   Because this Court finds no violation of the Confrontation Clause, it need
    not determine whether the error had a "substantial and injurious effect or influence in
25  determining the jury's verdict" under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637, 113
26  S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  The Court notes, however, that on habeas
    review,  whether a constitutional error was harmless is evaluated under this <u>Brecht</u>
27  standard, and not under the <u>Chapman</u> "harmless beyond a reasonable doubt" standard
28  repeatedly cited by petitioner in his Reply.

1        1.     <u>The record below</u>

2        The prosecution filed a motion in limine to admit evidence of petitioner's and

3 Reyes's membership in the "DK" gang, arguing that the evidence supported the theory

4 that the killing was gang-motivated. (<u>See</u> 1 CT 205-19). Reyes's counsel filed an

5 opposition, arguing that the evidence was overly prejudicial and only minimally

6 probative under California Evidence Code § 352. (<u>See</u> 1 CT 220-22). At a pre-trial

7 hearing, the trial court heard arguments regarding the admissibility of the evidence

8 from the prosecutor and both defense counsel. (<u>See</u> 1 RT 21-30). The trial court gave

9 an indicated ruling that the gang evidence would not be admissible for the purpose of

10 showing motive or intent because the killing appeared to be the result of a fight. The

11 court noted, however, that while it was not then ruling on the issue, "evidence of gang

12 intimidation may come in," particularly if that explained why Joel Vazquez (a friend

13 of the victim's) changed his earlier police statement, and/or if the defense opened the

14 door to the admission of other gang evidence. (<u>See</u> 1 RT 30-6, 43-5). The court also

15 indicated that the "issue of gang association, gang affiliation . . . may well develope

16 [sic] in this case depending on what happens." (<u>See</u> 1 RT 36).

17

18        *a.*     *<u>Joel Vazquez's testimony</u>*

19        Joel Vazquez was present at the party when the brawl, which resulted in Llamas'

20 death, broke out. The prosecutor attempted to clarify why Vazquez's initial statement

21 to police, indicating that he had seen petitioner strike the victim one time, was

22 inconsistent with a later statement indicating that he had seen petitioner hit the victim

23 twice, or maybe three times. The prosecutor questioned Vazquez regarding whether

24 he had been visited at his home by one of Reyes's friends. (<u>See</u> 2 RT 263-64).

25 Vazquez indicated that Scott Heyerman, a friend of Reyes's, had visited him and told

26 him that he (Heyerman) did not want any problems with Vazquez or his friends, that

27 neither he (Heyerman) nor any of his friends had anything to do with the killing, and

28 that petitioner "was the one that did it." (<u>See</u> 2 RT 264-65). Vazquez responded to

1  Heyerman that he had seen both Reyes and petitioner involved, that he did not want
2  anything to do with him (Heyerman), and to "quit bugging" him and not come back to
3  his house.  (See 2 RT 265).  Two weeks later, however, Heyerman returned to
4  Vazquez's house along with Susie Reyes, Reyes's sister.  Susie Reyes told Vazquez
5  that neither she nor her brother had anything to do with the killing and that petitioner
6  was a "rat."  Heyerman said, "fuck Scott. I hope he dies. I hope he rots in hell." (See
7  2 RT 266-67).

8        On cross-examination by Reyes's counsel, Vazquez testified that petitioner and
9  Reyes hung around the same group inside and outside school, but he would not say that
10  they attended school at the same time.  (See 2 RT 340-41).  Vazquez later testified on
11  cross-examination that he saw one "blow" from Reyes and one from petitioner, and
12  then saw two more swings from petitioner.  (See 2 RT 355).  Reyes's counsel inquired
13  whether anyone had told Vazquez to testify a certain way in court, and whether he was
14  intimidated by Heyerman's visits to his home.  Vazquez testified that no one had ever
15  tried to influence his testimony, and though he was not intimidated by Heyerman, the
16  visits did worry him as he was concerned for the safety of his parents and younger
17  brother, with whom he lived.  (See 2 RT 355-56).  He further testified that "weird
18  stuff" happened to his house after the incident, including cars being broken into, things
19  stolen out of the house, and spray painting near the walls around his house.  Vazquez
20  did not know who was responsible for these acts.  (See 2 RT 356-57).

21        On redirect, the prosecutor questioned Vazquez in greater detail regarding the
22  incidents that had happened since Heyerman's visits to his home.  He also elicited
23  testimony from Vazquez that he had personally witnessed Reyes being aggressive and
24  bullying towards other people, and that he had heard Reyes tell people not to "fuck"
25  with him because he was with a group of people.  Over defense objection, he testified
26  that he knew Reyes and petitioner to hang around in a group together.  (See 2 RT 358-
27  60).  In a sidebar, the trial court reminded Reyes's counsel that it had "cautioned" him
28  regarding opening the door.  The court found that the door had been opened and

17

1  allowed the prosecutor to inquire into Reyes's membership in the "DK" group -
2  without referring to it as a gang - but restricted the prosecutor's questions to Reyes's
3  membership in "DK" only, and not petitioner's. (See 2 RT 361-68). The prosecutor
4  then briefly questioned Vazquez regarding Reyes's association with a group called
5  "DK." Vazquez testified that Reyes was part of that group and that he (Vazquez) had
6  been present when Reyes bullied others at school, threatening them not to "fuck" with
7  him as he was from DK. (See 2 RT 368-69).

8

9              b.      _The Studley transcript_

10         The prosecutor intended to call Investigator Lujan to testify to Alisha Studley's
11  statement to police and to play the audio-tape of that statement. Studley was
12  petitioner's girlfriend, and she had been present at the party during the fight. With the
13  agreement of both defense counsel, the prosecutor indicated that he would remove any
14  objectionable references to gangs from the tape and the transcript that would be
15  distributed to the jurors. (See 2 RT 333-34).

16         While Lujan was on the stand, the prosecutor distributed the 63-page transcript
17  of the audio-taped statement, and the court advised the jurors that the transcript itself
18  was not evidence, but rather a guide. (See 2 RT 499). After a portion of the tape was
19  then played for the jurors,[11] there was a bench conference at which the prosecutor
20  apologized to the court and defense counsel and indicated that he had found some gang
21  references that he had originally missed. The first was a reference to "gang writing on
22  a rug" at the party; the second, evident later in the transcript, in a section of the tape
23  that had not yet been played for the jury, was a reference to "yelling profanity" and

24

25  _____

26         [11]     By agreement of counsel, the playing of the tape was not reported. While
27  it is not entirely clear how much of the tape was played for the jury, during the
    ensuing bench conference, the trial court did indicate that it had been "listening to this
28  tape now for twenty pages." (See 2 RT 499, 501).

1   "vato loco stuff."[12]  (See 2 RT 500).  After brief argument, the trial court reversed its
2   original ruling that the tape would be admissible.  It ordered that the transcripts be
3   collected from the jurors, and advised the prosecutor that Lujan could testify to
4   Studley's statements.  The bailiff then collected the transcripts, and the court ordered
5   the jury to disregard what it had heard so far on the tape and what it had read in the
6   transcript.  (See 2 RT 503).

7

8          2.     Applicable legal authority

9          As a general proposition, federal habeas courts "do not review questions of state
10  evidence law."  Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see also
11  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).
12  Federal habeas relief only is available if the petitioner is contending that he is in
13  custody in violation of the Constitution or laws or treaties of the United States.  See 28
14  U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. at 67-68 ("In conducting habeas
15  review, a federal court is limited to deciding whether a conviction violated the
16  Constitution, laws, or treaties of the United States."); Smith v. Phillips, 455 U.S. 209,
17  221, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) ("A federally issued writ of habeas corpus,
18  of course, reaches only convictions obtained in violation of some provision of the
19  United States Constitution.").

20         "Habeas relief is available for wrongly admitted evidence only when the
21  questioned evidence renders the trial so fundamentally unfair as to violate federal due
22  process." Jeffries v. Blodgett, 5 F.3d 1180, 1193 (9th Cir. 1993), cert. denied, 510 U.S.
23  1191 (1994); see also  Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998);

24  _____

25         [12]      The reference to the gang writing on the rug appeared on page 17 of the
26  transcript, so it would appear that the jury did hear this gang reference. (See 1 CT
27  263). Though the prosecutor indicated that the jury had not yet reached the part of the
28  tape wherein the vato loco reference was made, it appears on page 20 of the transcript.
    (See 1 CT 266).

1   Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995). "Only if there are no
2   permissible inferences the jury can draw from the evidence can its admission violate
3   due process." Jammal, 926 F.2d at 920; McKinney v. Rees, 993 F.2d 1378, 1384 (9th
4   Cir.), cert. denied, 510 U.S. 1020 (1993); see also Estelle v. McGuire, 502 U.S. at 70
5   (where the challenged evidence is relevant to an issue in the case, its admission cannot
6   be said to have violated the defendant's due process rights).

7

8          3.     The California Court of Appeal opinion
9          The California Court of Appeal rejected petitioner's challenge to the admission
10  of the gang evidence. With respect to Vazquez's testimony, the court concluded that
11  the "gang evidence was relevant to the issue of whether Vazquez's prior statements or
12  trial testimony was affected by any fear of retaliation"; to provide a reasonable basis
13  for Vazquez's concern for his family's safety; and "to provide[] a reasonable
14  explanation for Vazquez's prior inconsistent statements." Further, the appellate court
15  found that the trial court's limitations on the inquiry - including the exclusion of the
16  word "gang," coupled with the limited questioning by the prosecutor on the subject,
17  rendered the evidence not unduly prejudicial. With respect to the Studley transcript,
18  the appellate court concluded that "even if the court erred in playing the tape or in
19  giving the jury the transcript, the error was clearly harmless." Specifically, the
20  comment regarding gang writing on the rug did not implicate Reyes or petitioner as the
21  rug was in Johnson's back lot and the writing was observed by Studley on her way to
22  the party. With respect to the "Vato Loco" comment, the court concluded that the
23  prosecutor had not yet played the part of the tape containing this comment and that the
24  "claim of prejudice hinges on whether the jury read ahead, saw the comment, and
25  somehow connected defendants with the people who were shouting profanities and
26  using gang terminology." Moreover, neither defendant was mentioned as participants
27  in the shouting match during which this comment was overheard, and thus, this
28  comment also did not implicate Reyes or petitioner directly. The Court of Appeal

1  concluded that petitioner had failed "to show that gang references, individually or
2  collectively, so infected [his] trial that, without them, [he] would have obtained a more
3  favorable verdict." (See Lodgment No. 5 at 8-14).

4

5          4.    Analysis

6          With respect to Vazquez's testimony, the Court concurs with both the trial court
7  and the state appellate court that the gang evidence was relevant to the issue of whether
8  Vazquez's statements or trial testimony were affected by a fear of retaliation and to the
9  jury's assessment of Vazquez's credibility in light of his inconsistent statements.
10 Moreover, the prosecutor was not authorized to specifically use the word "gang"
11 during his questioning of Vazquez regarding Reyes's association with "DK"; his
12 inquiry of Vazquez on that subject was limited to two questions; and there was *no*
13 reference to petitioner's involvement in the "DK" group. It was Reyes who was said
14 to have bullied and threatened school-mates not to mess with him because he was part
15 of a "group." Given the relevance of the testimony that was admitted, the limitations
16 on the prosecutor's inquiry, and the fact that the testimony did not implicate petitioner
17 in the "DK" group, this Court has no basis for finding or concluding that the admission
18 of this gang evidence rendered petitioner's trial so fundamentally unfair as to violate
19 due process.[13]

20

21 _____

22          [13]    Petitioner's reliance on Kennedy v. Lockyer, 379 F.3d 1041, 1055-1056
   (9th Cir. 2004), cert. denied, Lockyer v. Kennedy, 544 U.S. 992 (2005) for the
23 proposition that "evidence relating to gang involvement will almost always be
   prejudicial and will constitute reversible error" and "evidence of gang membership
24 may not be introduced, as it was here, to prove intent or culpability" is misplaced.
25 (See Reply Mem. at 11 (citing Kennedy, 379 F.3d at 1055)). This language is dicta
   in a case addressing an indigent defendant's right to a full transcript of a prior mistrial.
26 In Kennedy, the defendant's initial trial - during which the first trial judge made
27 explicit rulings excluding evidence of petitioner's alleged involvement in a gang -
28                                                                    (continued...)

1      With respect to the Studley transcript, petitioner has adduced no evidence to
2  rebut the presumption that the jury failed to follow the instruction to disregard what it
3  had heard so far on the tape and what it had read in the transcript. Moreover, the Court
4  concurs with the California Court of Appeal that neither the reference to the rug with
5  gang writing on it nor the "vato loco" comment implicated petitioner or connected him
6  to a gang. Thus, even if the jury did hear or read both references, and even if the jury
7  then ignored the trial court's instruction to disregard what it had heard or read, the
8  //
9
10
11      [13](...continued)
    resulted in a hung jury. Petitioner was denied a full transcript of that trial, and the
12  attorney at his second trial did not have that part of the transcript evincing these trial
13  court rulings. The prosecutor - aware of the first exclusionary ruling - proceeded to
    deliberately elicit gang testimony at petitioner's second trial, at which he was
14  convicted. See id. at 1045. The Ninth Circuit granted habeas relief, finding that the
15  petitioner was entitled to a full transcript of the prior proceedings; that the state court's
16  decision was contrary to clearly established federal law; and that the denial of a
    complete transcript here had a substantial and injurious effect on the jury's verdict.
17  See id. at 1049, 1052, 1054. In making the determination that the Brecht standard had
18  been met, the Ninth Circuit cited to the prosecutor's deliberate elicitation of forbidden
19  gang evidence in the second trial, which it found prejudicial.
          Here, unlike in Kennedy, and contrary to petitioner's contention (see Reply
20  Mem. at 12), evidence of gang membership was not introduced to prove intent,
21  culpability, or guilt by association. In fact, the trial court ruled gang evidence
22  inadmissible to prove intent or motive as it appeared the murder was simply the result
    of a fight. (See 1 RT 30-6). The evidence that was admitted established Reyes's
23  membership in the "DK" group - not petitioner's. Even after the trial court ruled that
24  Reyes's counsel had "opened the door" to further inquiry by the prosecutor, neither
    the "gang" evidence elicited - if it can be called that - nor the references in the Studley
25  statement - linked petitioner to a gang, inculpated him in the crime, or suggested guilt
26  by association. Moreover, importantly, as the Court of Appeal found, Vazquez's
27  testimony was relevant to explain Vazquez's prior inconsistent statements. Thus, its
    admission cannot be said to have violated due process. See Estelle v. McGuire, 502
28  U.S. at 70.

1  Court has no basis for finding or concluding that the admission of this gang evidence
2  rendered petitioner's trial so fundamentally unfair as to violate due process.

3       The Court therefore finds and concludes that the state courts' rejection of
4  petitioner's claim neither was contrary to nor involved an unreasonable application of
5  clearly established federal law, as determined by the United States Supreme Court.

6

7  **C.     Habeas relief is not warranted with respect to petitioner's instructional**
8  **error claim.**

9       At trial, the trial court, prosecutor, and defense counsel agreed that both CALJIC
10  Nos. 5.54 and 5.56 (which respectively address self-defense by an initial aggressor and
11  self-defense by a mutual combatant) were applicable to the case. (See 3 RT 813-14).
12  The court consequently instructed the jury pursuant to these instructions as follows:

13       "The right of self-defense is only available to a person who initiated an
14       assault if he has done all of the following: number one, he has actually
15       tried in good faith to refuse to continue fighting; two, he has clearly
16       informed his opponent that he wants to stop fighting; and three, he has
17       clearly informed his opponent that he has stopped fighting. [¶] After he
18       has done all three things, he has the right to self-defense if the opponent
19       continues to fight." (See 4 RT 842; 2 CT 560).

20

21       "The right of self-defense is only available to a person who engages in
22       mutual combat if he has done all of the following: number one, he has
23       actually tried in good faith to refuse to continue fighting; two, he has
24       clearly informed his opponent that he wants to stop fighting; three, he has
25       clearly informed his opponent that he has stopped fighting; and four, he
26       has given his opponent the opportunity to stop fighting. [¶] After he has
27       done all four things, he has the right to self-defense if his opponent
28       continues to fight." (See 4 RT 842; 2 CT 562).

1    Neither defense counsel requested that the jury also be instructed that a person

2 involved in a non-felonious assault, whose opponent responds with deadly force so

3 suddenly that the person cannot withdraw, may immediately use deadly force in self-

4 defense. See, e.g., People v. Quach, 116 Cal. App. 4th 294, 300-03, 10 Cal. Rptr. 3d

5 196 (2004), and cases cited therein.[14] Petitioner contends, however, that CALJIC Nos.

6 5.54 and 5.56 were erroneous and violated his Fourteenth Amendment right to a fair

7 trial of his defense because they did not include this sudden escalation exception. (See

8 Lodgment No. 8 at 2; Reply Mem. at 8-10).

9    On direct review to the California Court of Appeal, petitioner raised this

10 instructional error claim on state law grounds only, relying principally on Quach. (See

11 Lodgment No. 2 at 23-30; Lodgment No. 4 at 7-10).[15]  In rejecting the claim, the

12 appellate court found Quach factually distinguishable. It noted that Anthony Mendoza

13 had been the only witness who testified that Llamas had been armed with a wooden

14 board during his brawl with petitioner and that he had used the board to swing at

15 petitioner.  While California law recognized that the testimony of one witness may be

16 sufficient to warrant a requested instruction, California law also recognized that, "when

17 the witness's testimony contradicts other evidence presented by both the prosecution

18 and the defense, it may not constitute substantial evidence - i.e., evidence that a

19 reasonable jury would find persuasive - to warrant a sua sponte instruction." Arguably,

20

21    [14]    Quach was decided after petitioner's trial.  After the issuance of Quach,

22 the following bracketed language was added to CALJIC No. 5.54: "If the victim of
simple assault responds in a sudden and deadly counterassault, the original aggressor

23 need not attempt to withdraw and may use reasonably necessary force in self-

24 defense." CALJIC No. 5.54 (2004 Re-Revision).  Similar bracketed language was
added to CALJIC No. 5.56. See CALJIC No. 5.56 (2004 Re-Revision).

25

26    [15]    The Court notes that, while petitioner did frame this instructional error

27 claim as a violation of his Fourteenth Amendment right a fair trial of his defense in
his Petition for Review to the California Supreme Court, he did not cite any federal

28 authority in support of the claim. (See Lodgment No. 8 at 2, 8-11).

24

1 the appellate court thus reasoned, "if the trial court has no sua sponte obligation to give
2 CALJIC Nos. 5.54 or 5.56, the court should not be required without a request to give
3 the optional paragraph with the alternative defense theory." (See Lodgment No. 5 at
4 16-17).

5       In any event, the Court of Appeal concluded, even assuming that the trial court
6 erred in failing to instruct the jury on the sudden escalation exception, "the
7 circumstances in this case render[ed] the error harmless beyond a reasonable doubt."
8 (See Lodgment No. 5 at 17). In this regard, the appellate court reasoned:

9         "Mendoza's testimony contradicted evidence presented by both the
10         prosecution and the defense. None of the other witnesses testified that
11         Llamas was holding a wooden board. Joel and Alex Vasquez testified
12         that Llamas was unarmed. Even Reyes's friend, Jiminez, testified that the
13         victim was not holding a weapon. Nothing in the record, therefore,
14         supported Mendoza's version of the facts. In addition, contrary to Reyes's
15         own admission, Mendoza testified that Reyes was not involved in the
16         fight with Llamas, but was standing off to the side. Also, while the other
17         witnesses testified that [petitioner] was standing face-to-face with Llamas,
18         Mendoza claimed that he was standing in front of Llamas. Because of
19         these inconsistencies, the jury undoubtedly rejected Mendoza's testimony
20         as a futile attempt to exonerate his friend." (Lodgment No. 5 at 17).

21

22       To the extent that petitioner merely is contending that an instruction on the
23 sudden escalation exception should have been given as a matter of California law, his
24 instructional error claim is not even cognizable on federal habeas review. See 28
25 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. at 71-72.

26       To merit federal habeas relief on his claim that the trial court erred by omitting
27 an instruction on the sudden escalation exception, petitioner must allege and then show
28 that the omission so infected the entire trial that the resulting conviction violated his

1  federal constitutional right to due process. See Henderson v. Kibbe, 431 U.S. 145,
2  154, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977); Cupp v. Naughten, 414 U.S. 141, 147,
3  94 S. Ct. 396, 38 L. Ed. 2d 368 (1973); Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th
4  Cir. 1988). "Where the alleged error is the failure to give an instruction, the burden on
5  the petitioner is 'especially heavy.'" Hendricks v. Vasquez, 974 F.2d 1099, 1106 (9th
6  Cir. 1992) (quoting Kibbe, 431 U.S. at 155).

7          Moreover, even assuming arguendo that petitioner's claim is cognizable on
8  federal habeas review and that the failure to instruct the jury on the sudden escalation
9  exception violated petitioner's federal constitutional right to due process as a matter
10 of clearly established Supreme Court law, petitioner still would not be entitled to
11 habeas relief unless the error had a "substantial and injurious effect or influence in
12 determining the jury's verdict." See Brecht, 507 U.S. at 637-38; see also Bradley v.
13 Duncan, 315 F.3d 1091, 1099 (9th Cir. 2002) (holding that the failure to properly
14 instruct the jury is a trial error subject to harmless-error analysis), cert. denied, 540
15 U.S. 963 (2003). The Court has no basis for so finding or concluding here. Petitioner
16 does not dispute the appellate court's finding that Mendoza was the only witness who
17 testified that Llamas had been armed with a wooden board during his brawl with
18 petitioner and that he had used the board to swing at petitioner. As the appellate court
19 further found and as the Court's own review of the record substantiates, Mendoza's
20 testimony in this regard was contradicted by the testimony of other prosecution and
21 defense witnesses. (See 2 RT 249, 386-87, 392; 3 RT 551-53, 668-69). For the same
22 reasons the California Court of Appeal concluded that the instructional error, if any,
23 was harmless beyond a reasonable doubt, this Court is unable to find or conclude that
24 the trial court's failure to instruct the jury on the sudden escalation exception had a
25 substantial and injurious effect or influence in determining the jury's verdict. Rather,
26 the Court concurs with the Court of Appeal that the jury likely viewed Mendoza's
27 version of the events as "a futile attempt to exonerate his friend."
28 //

1    Alternatively, the Court finds and concludes that the California Court of Appeal
2  did not apply harmless error review in an "objectively unreasonable" manner.  See
3  Mitchell v. Esparza, 540 U.S. 12, 18, 124 S. Ct. 7, 12, 157 L. Ed. 2d 263 (2003).

4

5                          **RECOMMENDATION**

6          IT THEREFORE IS RECOMMENDED that the District Court issue an Order:
7  (1) approving and adopting this Report and Recommendation; and (2) directing that
8  Judgment be entered denying the Petition and Amended Petition, and dismissing this
9  action with prejudice.

10

11 DATED:    August 3, 2006

12

13

14

15                     ROBERT N. BLOCK
16                     UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

                                    27